**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| LUTHER JEROME WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:07-cv-307-MEF-SRW |
| | ) | |
| RICHARD ALLEN, Commissioner Alabama Department of Corrections, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR A TEMPORARY STAY OF EXECUTION**

Pursuant to this Court's Order of June 7, 2007, (Doc. #19) Plaintiff Luther Jerome Williams files this supplemental brief in support of his motion for a temporary stay of execution to address the legal principles set forth in Hill v. McDonough, 126 S. Ct. 2096, 2104 (2006); Nelson v. Campbell, 541 U.S. 637, 649–50 (2004); Jones v. Allen, 485 F.3d 635 (11th Cir. 2007); Diaz v. McDonough, 472 F.3d 849 (11th Cir. 2006); and Rutherford v. McDonough, 466 F.3d 970 (11th Cir. 2006).

All of the above cited cases, with the exception of Diaz, involved requests for what the Eleventh Circuit in Klay v. United Healthgroup, Inc., 376 F.3d 1092, 1097 (11th Cir. 2004), called "traditional" injunctions—*i.e.*, the type that require a showing that the applicant has a substantial likelihood of success on the merits, that he will suffer irreparable injury absent the injunction, that the balance of harms weighs in favor of an injunction, and that an injunction would not be against the public interest. *See* Hill, 126 S. Ct. at 2104; Nelson, 541 U.S. at 649–50; Jones, 485 F.3d at 638; Rutherford, 466 F.3d at 976; *see also* Rutherford, 466 F.3d at 979 (Wilson, C.J., dissenting). As Mr. Williams seeks a stay in aid of jurisdiction under the All

Writs Act, 28 U.S.C. § 1651(a), rather than a "traditional" injunction, none of these cases address the proper standard for this Court's evaluation of his motion. *See* Klay, 376 F.3d at 1100 ("The requirements for a traditional injunction do not apply to injunctions under the All Writs Act because a court's traditional power to protect its jurisdiction, codified by the Act, is grounded in entirely separate concerns.").

Only in Diaz was there a request for an All Writs Act stay, and only in Diaz does the court discuss the proper standard for issuance of a stay under the Act. *See id.*, 472 F.3d at 851. In Diaz, the plaintiff sought an All Writs stay at the appellate level "for the purpose of allowing time to pursue his appeal" after the district court denied his request for a traditional injunction in connection with a § 1983 suit filed less than three days before his scheduled execution. *Id.* In ruling on his motion, the Eleventh Circuit reaffirmed that "[t]o obtain an injunction under the All Writs Act, the injunction 'must simply point to some ongoing proceeding, or some past order or judgment, the integrity of which is being threatened by someone else's action or behavior.'" *Id.* (quoting Klay, 376 F.3d at 1100). After observing that Diaz properly invoked appellate jurisdiction, the panel concluded that under the Act "[w]e could grant an injunction to protect our jurisdiction to hear Diaz's appeal." *Id.*

Here, Mr. Williams has properly invoked the jurisdiction of this Court, and thus the Court may properly grant a stay under the Act to hear the merits of his claim.

As to the equities, Angel Diaz's execution had originally been set for October 1989, *see* Diaz v. State of Florida, 945 So.2d 1136, 1140 (Fla. 2006), but he first filed his federal-court challenge to Florida's method of execution on December 11, 2006. Diaz, 472 F.3d at 850. During those seventeen intervening years, Diaz fully discovered, litigated, and appealed a federal habeas petition and no less than *five* separate post-conviction challenges in the state courts of

Florida. Diaz, 945 So.2d at 1140–42. Diaz's *fourth* successive state challenge, which culminated at Florida's Supreme Court, alleged that the state's lethal injection protocols violated the constitutional prohibition on cruel and unusual punishments—the same claim that Diaz subsequently filed in the federal district court just three days before his long-postponed execution. *See* *id.* at 1141–42, and 1144. In light of that history, the Eleventh Circuit applied "a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." Diaz, 472 F.3d at 850 (quoting Hill, 126 S. Ct. at 2104). Given his original execution date, for example, it is clear that Diaz's execution-method challenge had been ripe for years. Moreover, he had already fully litigated the same constitutional claim in state courts. Thus, reasoned the Eleventh Circuit, "Diaz cannot claim that he could not have filed his federal complaint at an earlier date that would have allowed the courts to address the complaint on the merits without the necessity of a stay." *Id.* at 851.

Unlike Diaz, the equities here warrant the issuance of a temporary stay in aid of jurisdiction because Mr. Williams timely filed his federal-court challenge to Alabama's execution method. The "strong equitable presumption against the grant of a stay" only applies in cases where the claim "could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *See* Hill, 126 S. Ct. at 2104; Nelson 541 U.S. at 650; *see also* Rutherford, 466 F.3d at 979 (Wilson, C.J., dissenting). Mr. Williams filed this suit—his first and only execution-method challenge—before any execution date had been set and only fifteen days after the conclusion of his federal habeas review. Prior to the United States Supreme Court's denial of certiorari on March 26, 2007, Mr. Williams' execution-method challenge was premature and unripe because habeas relief, had it been granted, would have mooted it. *See, e.g.*,

Texas v. United States, 523 U.S. 296, 300 (1998)("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."). Given the pendency, at that time, of several other suits in this very Court challenging the constitutionality of Alabama's execution method, it was not certain until the State actually moved, on April 4, 2007, to set an execution date whether Defendants would seek to execute Mr. Williams using the challenged method (or some other) before this Court had an opportunity to reach the merits of the serious constitutional issues raised.

Moreover, it was not until the Supreme Court's decision in Hill, 126 S. Ct. at 2096, that it was even possible for Mr. Williams to bring this suit without facing summary dismissal on jurisdictional grounds. *See*, *e.g.*, Rutherford, 466 F.3d at 977 ("Circuit law did not change until the Supreme Court issued its Hill decision on June 12, 2006."). As discussed in Mr. Williams' memoranda in opposition to Defendants' motion to dismiss (Docs. #8 and #14), which he hereby incorporates by reference, the non-public nature of Alabama's execution protocols, which have apparently changed over time, *see*, *e.g.*, Jones v. Allen, ___ F. Supp. 2d ___, 2007 WL 1140416 at *4 & n.2 (M.D. Ala. April 17, 2007), and the fact that the relevant Eighth Amendment standard is rooted in the ever-changing present, *see*, *e.g.*, Trop v. Dulles, 356 U.S. 86, 100–101 (1958), also raise practical limitations as to when this suit could have been filed. For purposes of Plaintiff's motion, even if such practical concerns did not impose an absolute bar to filing suit, they should nevertheless weigh in Plaintiff's favor when placed on the equitable scales.

Even to the extent that other equitable factors mentioned in Hill and Nelson are pertinent under the All Writs Act, there is nothing in those cases that forecloses a stay here. While it is true that both the state and the victims of crime have an "important interest in the timely enforcement of a sentence," Hill, 126 S. Ct. at 2104; *accord*. Jones, 485 F.3d at 638; Rutherford,

466 F.3d at 974, there is no authority that holds that such an interest is insurmountable or must invariably sway the balance against every plaintiff who seeks a stay. "In fact, the equitable considerations in each case are naturally different." Jones, 485 F.3d at 641 n.4. Here, in addition to Mr. Williams' equally valid interests in having his § 1983 claims heard and decided on the merits and in not being executed by a method that unconstitutionally violates his right to be free from cruel and unusual punishment, the state's enforcement interests are also counterbalanced by this Court's own substantial interest, indeed "constitutional obligation," *see* Klay, 376 F.3d at 1099, to protect its jurisdiction from conduct which impairs its ability to carry out its Article III functions.

Mr. Williams has not engaged in a dilatory pattern of "[r]epetitive or piecemeal litigation." *See* Hill, 126 S. Ct. at 2104; *see also* Rutherford, 466 F.3d at 974. By contrast, the Supreme Court in Nelson and the Eleventh Circuit in Jones both alluded to the Supreme Court's prior decision in Gomez v. United States Dist. Court for the Northern Dist. of Cal., 503 U.S. 653 (1992). *See* Nelson, 541 U.S. at 649; Jones, 485 F.3d at 639, n.2. The death-row inmate in Gomez, Robert Alton Harris, had filed no less than *four* prior federal habeas petitions but "waited until the eleventh hour" before raising his constitutional challenge to California's gas chamber. *See* Nelson, 541 U.S. at 649. Presumably, his execution-method challenge had become ripe at the conclusion of his first federal habeas suit. After describing Mr. Harris' last-minute § 1983 action as an "obvious attempt at manipulation," the Court concluded that "This claim could have been brought more than a decade ago." Gomez, 503 U.S. at 654. In Diaz, as discussed above, the inmate had likewise filed a whole series of successive and piecemeal post-conviction actions and had already fully litigated his constitutional challenge to Florida's execution method in the state courts before filing his last-minute federal suit. *Id.*, 472 F.3d at

850; *see also* Diaz v. State of Florida, 945 So. 2d at 1140–42. A similar pattern was evident in Grayson v. Allen, 2007 WL 1491009 (M.D. Ala. May 21, 2007), where the inmate filed his § 1983 execution-method challenge only after he had fully litigated, appealed, and sought certiorari in an earlier round of unrelated, post-habeas § 1983 claims. *Id.* at *3. Had Mr. Grayson filed his execution-method claim promptly upon the conclusion of his federal habeas review, as Mr. Williams did, he would have had some four and a half years in which to litigate that claim.

Mr. Williams' suit raises important questions regarding whether Alabama's method of execution comports with the Eighth and Fourteenth Amendments. His is a cognizable claim under 42 U.S.C. § 1983 pursuant to the Supreme Court's decision in Hill, 126 S. Ct. at 2100; *see also* Gregg v. Georgia, 428 U.S. 153, 173 (1976)(Eighth Amendment prohibits infliction of unnecessary and wanton pain). Particularly in light of recent press accounts of botched lethal-injection executions, *see*, *e.g.*, Julie Carr Smyth, *Ohio Drawn into Executioner ID Debate*, ABC News Online, June 5, 2007 (available at http://abcnews.go.com/US/wireStory?id=3244826) (attached as Exhibit A), and the emerging medical science that the three-drug cocktail commonly used for executions might be "insufficient to induce surgical anesthesia for the duration of the execution," *see* Teresa A. Zimmers, *et al.*, *Lethal Injection for Execution: Chemical Asphyxiation?*, 4 PLoS Medicine e156 (April 2007)(available at http://medicine.plosjournals.org/perlserv/?request=get-document&doi=10.1371/journal.pmed.0040156)(attached as Exhibit B), this Court cannot conclude that Mr. Williams' claims are somehow too "speculative" to be heard, *see* Hill, 126 S. Ct. at 2104, or that his complaint is "frivolous on its face." *See* Nelson, 541 U.S. at 650.

Mr. Williams does not contend that by filing a § 1983 action he is automatically entitled to a stay "as a matter of right," *see* Hill, 126 S. Ct. at 2104; Nelson, 541 U.S. at 649; Jones, 485 F.3d at 638, but the equities here weight strongly in his favor. A stay under the All Writs Act may be granted "whenever it is 'calculated in [the court's] sound judgment to achieve the ends of justice entrusted to it.'" Klay, 376 F.3d at 1100 (quoting Adams v. United States, 317 U.S. 269, 273 (1942)). Mr. Williams presents a legitimate and timely claim that the lethal injection protocol awaiting him may constitute cruel and unusual punishment forbidden by the Eighth Amendment. He has entrusted this Court to fairly and impartially adjudicate his claims, and the Court should grant Mr. Williams' motion so that it can reach the merits of this case before the Defendants' actions deprive it of any chance to do so.

Respectfully submitted,

/s/ Joel L. Sogol
Joel L. Sogol, Esq. (SOG-001)
811 21st Avenue
Tuscaloosa, AL 35401
(205) 345-0966
Fax: (205) 345-0971
Email: jlsatty@wwisp.com

/s/ Christopher H. Little
Christopher H. Little, Esq. (R.I. #1789)
LITTLE MEDEIROS KINDER BULMAN & WHITNEY, P.C.
72 Pine Street
Providence, RI 02903
(401) 272-8080
Fax (401) 521-3555
Email: clittle@lmkbw.com,

Counsel for Luther Jerome Williams

Dated: June 15, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of June 2007, I caused a true copy of the within Supplemental Brief In Support of Plaintiff's Motion for a Temporary Stay of Execution to be filed electronically with the Court's CM/ECF system and thereby served upon each of the following via email:

James Clayton Crenshaw, Esq.
(ccrenshaw@ago.state.al.us)
Office of the Attorney General
Alabama State House
11 South Union Street
Montgomery, AL 36130

James William Davis, Esq.
(jimdavis@ago.state.al.us)
Office of the Attorney General
Alabama State House
11 South Union Street
Montgomery, AL 36130

/s/ Joel L. Sogol

# Exhibit A





ABC News: Ohio Drawn Into Executioner ID Debate Case 2:07-cv-00307-MEF-SRW Document 20-2 Filed 06/15/2007 Page 3 of 2 Page 1 of 2

The new
at&t
Your world. Delivered.

abc NEWS
Thursday, June 14, 2007

Good Morning America | World News | 20/20 | i-CAUGHT | Primet
GMA: Latest on the Toothpaste Recall; How to Tell If You're a Workah

Register | Sign In

Home | News Summary | World | U.S. | Blotter | Politics | Money | Health | Entertainment | ESPN Sports

**FORMER U.N. SECRETARY-GENERAL KURT WALDHEIM HAS DIED, ACCORDING TO SERVED AS SECRETARY GENERAL FROM 1972-81.**

Home > US

# Ohio Drawn Into Executioner ID Debate

ACLU of Ohio Request Draws State Into Debate Over Publicly Identifying Executioners

**By JULIE CARR SMYTH Associated Press Writer**
The Associated Press
COLUMBUS, Ohio Jun 5, 2007 (AP)

At Christopher Newton's execution by lethal injection last month, it took 90 minutes and at least 10 stabs of the needle for the execution team to find a vein. The procedure was so drawn out the staff paused to allow Newton a bathroom break.

The American Civil Liberties Union of Ohio responded with a wide-ranging request for state records, seeking, among other things, the names of the volunteer medics and guards who oversaw it. The request has drawn Ohio into a wider debate over whether executioners' identities should be kept secret.

Death penalty opponents say Newton's May 24 lethal injection was the latest in a series of botched executions nationwide, and that executioners' identities and professional credentials should be open to public scrutiny.

They point to the case of Dr. Alan Doerhoff, a participant in Missouri executions who was revealed in news reports to have been sued for malpractice more than 20 times. The state is no longer using his services.

Font Size
A A A
E-mail
Print

TOP US STORIES

- Off the Rails: 1.5M Train Toys Recalled
- Tainted Toothpaste? 4 States Sell Import
- Theft Rising at U.S. Wal-Mart Stores

RELATED TOPICS

- Angel Diaz
- Christopher Newton
- Death Penalty Information Center

Talk Back
+ Tell us what you think
+ Add new facts
+ Talk straight to the newsmakers

Comment

WHAT OTHERS ARE SAYING

COMMENT

Contribute

Add to the facts. Tell us what you know.

CONTRIBUTE

Vote

Currently there is no ballot

http://abcnews.go.com/US/wireStory?id=3244826 6/14/2007

ABC News: Ohio Drawn Into Executioner ID Debate Page 2 of 2

American Medical Assn

They also point to the December execution of Florida inmate Angel Diaz, who took 34 minutes twice as long as usual to die. Executioners administered a rare second dose of lethal chemicals to Diaz, and an autopsy found the needles had been pushed through Diaz's veins into the flesh of his arms.

A commission created afterward to study the incident called for more training and better protocols for executioners.

Richard Dieter, executive director of the Washington, D.C.-based Death Penalty Information Center, which opposes the death penalty, said the public can't properly scrutinize the effectiveness of capital punishment without adequate information on those carrying it out.

"Public executions should be as public as possible," he said. "They supposedly have nothing to hide, and as with anything government does, it benefits from more scrutiny. For medical personnel, yes, there may be a cost. But that's sort of like the cost that the state, or all of us, bear."

But death penalty advocates like Michael Rushford, president of the Criminal Justice Legal Foundation in Sacramento, Calif., accuse capital punishment opponents of wanting to expose members of execution teams to intimidate them.

Ohio Drawn Into Executioner ID Debate
1 2 3 Next

Comment on This Story

question for this story. Do you have an idea for something to ask? Send it in here!

## : Discuss and Debate

**DISCUSS THIS TOPIC WITH THE ABC NEWS COMMUNITY** Read All

View All Message Boards

## : Be Seen, Be Heard

**WATCH & LISTEN** Watch All

Citizen Journalists: Click Here To Ask The Newsmakers Questions

be SEEN
be HEARD
CONNECT WITH NEWSMAKERS

Check out the video discussion going on now

POST VIDEO

**Sponsored Links**

**Lose 20 lbs by JULY 4th**
Featured on Oprah, Hoodia is a weight loss secret! Try a Free Sample
www.curbyourcravings.com

**Lose 25 Pounds This Month**
Oprah and CBS featured Hoodia, a dieting miracle. Try a Free Sample
http://www.mylipoplex.com

**Mortgage Rates Fall Again**
$430,000 for $1299/Mo. Think you pay too much? Calculate new payment.
Mortgage-Rates.lowermybills.com

**Buy a link here**

**Feedback** | **Wireless** | **E-mails & News Alerts** | **Message Boards** | **RSS Headlines** |
Contact Us | ABC.com | Site Map | Advertising Info | Terms of Use | Privacy Policy

External links are provided for reference purposes. ABC News is not responsible for the content of external internet sites

http://abcnews.go.com/US/wireStory?id=3244826 6/14/2007

# Exhibit B

OPEN ACCESS Freely available online PLoS MEDICINE

# Lethal Injection for Execution: Chemical Asphyxiation?

**Teresa A. Zimmers[1,2], Jonathan Sheldon[3], David A. Lubarsky[4,5], Francisco López-Muñoz[6], Linda Waterman[7], Richard Weisman[8], Leonidas G. Koniaris[1,2*]**

**1** Dewitt Daughtry Family Department of Surgery, University of Miami Miller School of Medicine, Miami, Florida, United States of America, **2** Department of Cell Biology and Anatomy, University of Miami Miller School of Medicine, Miami, Florida, United States of America, **3** Devine, Connell & Sheldon, P.L.C., Fairfax, Virginia, United States of America, **4** Department of Anesthesiology, Perioperative Medicine, and Pain Management, University of Miami Miller School of Medicine, Miami, Florida, United States of America, **5** Department of Management, University of Miami School of Business, Miami, Florida, United States of America, **6** Department of Pharmacology, University of Alcalá, Madrid, Spain, **7** Department of Comparative Medicine and Pathology, University of Miami Miller School of Medicine, Miami, Florida, United States of America, **8** Florida Poison Center–Miami, University of Miami Miller School of Medicine, Miami, Florida, United States of America

## ABSTRACT

### Background

Lethal injection for execution was conceived as a comparatively humane alternative to electrocution or cyanide gas. The current protocols are based on one improvised by a medical examiner and an anesthesiologist in Oklahoma and are practiced on an ad hoc basis at the discretion of prison personnel. Each drug used, the ultrashort-acting barbiturate thiopental, the neuromuscular blocker pancuronium bromide, and the electrolyte potassium chloride, was expected to be lethal alone, while the combination was intended to produce anesthesia then death due to respiratory and cardiac arrest. We sought to determine whether the current drug regimen results in death in the manner intended.

### Methods and Findings

We analyzed data from two US states that release information on executions, North Carolina and California, as well as the published clinical, laboratory, and veterinary animal experience. Execution outcomes from North Carolina and California together with interspecies dosage scaling of thiopental effects suggest that in the current practice of lethal injection, thiopental might not be fatal and might be insufficient to induce surgical anesthesia for the duration of the execution. Furthermore, evidence from North Carolina, California, and Virginia indicates that potassium chloride in lethal injection does not reliably induce cardiac arrest.

### Conclusions

We were able to analyze only a limited number of executions. However, our findings suggest that current lethal injection protocols may not reliably effect death through the mechanisms intended, indicating a failure of design and implementation. If thiopental and potassium chloride fail to cause anesthesia and cardiac arrest, potentially aware inmates could die through pancuronium-induced asphyxiation. Thus the conventional view of lethal injection leading to an invariably peaceful and painless death is questionable.

*The Editors' Summary of this article follows the references.*

**Funding:** The authors received no specific funding for this study.

**Competing Interests:** JPS practices capital defense. DAL has been a paid expert consultant in death penalty litigation. The other authors have no conflicts to disclose.

**Academic Editor:** Clifford J. Woolf, Harvard Medical School, United States of America

**Citation:** Zimmers TA, Sheldon JP, Lubarsky DA, López-Muñoz F, Waterman L, et al. (2007) Lethal injection for execution: Chemical asphyxiation? PLoS Med 4(4): e156. doi:10.1371/journal.pmed.0040156

**Received:** September 27, 2006
**Accepted:** March 2, 2007
**Published:** April 24, 2007

**Copyright:** © 2007 Zimmers et al. This is an open-access article distributed under the terms of the Creative Commons Attribution License, which permits unrestricted use, distribution, and reproduction in any medium, provided the original author and source are credited.

**Abbreviations:** ECG, electrocardiogram; HED, human equivalent dose; IV, intravenous

*To whom correspondence should be addressed. E-mail:LKoniaris@med.miami.edu



## Introduction

In the United States, lethal injection can be imposed in 37 states and by the federal government and military. The origin of the lethal injection protocol can be traced to legislators in Oklahoma searching for a less expensive and potentially more humane alternative to the electric chair [1]. Both the state medical examiner and a chairman of anesthesiology appear to have been consulted in writing of the statute. The medical examiner has since indicated that no research went into his choice of drugs—thiopental, pancuronium bromide, and potassium chloride—but rather he was guided by his own experience as a patient [2]. His expectation was that the inmate would be adequately anesthetized, and that although each individual drug would be lethal in the dosage specified, the combination would provide redundancy. The anesthesiologist's input relating to thiopental was written into law as "the punishment of death must be inflicted by continuous, intravenous administration of a lethal quantity of an ultra-short-acting barbiturate in combination with a chemical paralytic agent" [3], although in practice Oklahoma uses bolus dosing of all three drugs [4,5]. Texas, the first state to execute a prisoner by lethal injection, and subsequently other jurisdictions, copied Oklahoma's protocol without any additional medical consultation [1].

Although executioners invariably achieve death, the mechanisms of death and the adequacy of anesthesia are unclear. Used independently in sufficiently high doses, thiopental can induce death by respiratory arrest and/or circulatory depression, pancuronium bromide by muscle paralysis and respiratory arrest, and potassium chloride by cardiac arrest. When used together, death might be achieved by a combination of respiratory arrest and cardiac arrest due to one or more of the drugs used. Because thiopental has no analgesic effects (in fact, it can be antianalgesic) [6], and because pancuronium would prevent movement in response to the sensations of suffocation and potassium-induced burning, a continuous surgical plane of anesthesia is necessary to prevent extreme suffering in lethal injection.

Recently we reported that in most US executions, executioners have no anesthesia training, drugs are administered remotely with no monitoring for anesthesia, data are not recorded, and no peer review is done [7]. We suggested that such inherent procedural problems might lead to insufficient anesthesia in executions, an assertion supported by low postmortem blood thiopental levels and eyewitness accounts of problematic executions. Because of a current lack of data and reports of problems with lethal injection for executions, we sought to evaluate the three-drug protocol for its efficacy in producing a rapid death with minimal likelihood of pain and suffering.

## Methods

North Carolina lethal injection protocols were determined from Department of Corrections drug procurement records and testimony of prison personnel participating in the process. Times to death were determined from North Carolina Department of Corrections documents including the Web site [8], official statements, and corroborating news and eyewitness reports. Start times were available for 33 executions, of which 19 could be independently confirmed. The North Carolina warden pronounces death after a flat line is displayed on the electrocardiogram (ECG) monitor for 5 min, thus time to death was calculated from start time to pronouncement of death less 5 min. Dosages were calculated from postmortem body weights taken from Reports of Investigation by the North Carolina Office of the Chief Medical Examiner. Information regarding the California protocol and execution logs and Florida and Virginia executions were obtained through available court documents [9,10,11]. Data are expressed as mean ± standard deviation. One-way ANOVA with Tukey's multiple comparison test was used for statistical analysis.

## Results

### Data from North Carolina Executions

Three lethal injection protocols have been used in North Carolina from the first execution in 1984 to the most recent at the time of this writing in August 2006 (Figure 1A). The initial use of serial, intravenous (IV) injections of 3 g of thiopental and 40 mg of pancuronium bromide (referred to here as "Protocol A," $n = 8$, Figure 1A) was superseded by Protocol B in 1998. Protocol B consisted of serial injections of 1.5 g of thiopental, 80 mEq of potassium chloride, 40 mg of pancuronium bromide, 80 mEq of potassium chloride, and finally 1.5 g of thiopental ($n = 21$) [1,12]. After criticism from expert witnesses [13], in 2004 the injection order was changed to the current protocol of serial injections of 3 g of thiopental, 40 mg of pancuronium bromide, and 160 mEq of potassium chloride (Protocol C, $n = 11$) [14]. Each injection is performed in rapid succession with intermittent saline flushes to avoid drug precipitation. Until the last two executions in 2007, no assessment or monitoring of anesthesia was performed.

According to the North Carolina Department of Corrections, once the ECG monitor displays a flat line for 5 min, the warden declares death and a physician certifies that death has occurred [7, 12]. Execution start times and declaration times were available for 33 of the 42 lethal injections conducted in North Carolina (Figure 1B). Mean times to death were 9.88 ± 3.87 min for Protocol A, 13.47 ± 4.88 min for Protocol B, and 9.00 ± 3.71 min for Protocol C. The mean time to death for Protocol B was significantly longer than for Protocol C ($p < 0.05$, Tukey-Kramer test after one-way ANOVA). No other differences were statistically significant. These data indicate that the five-dose regimen of Protocol B slightly prolonged time to death, but more importantly, they indicate that the addition of potassium chloride did not hasten death overall.

In contrast to clinical use of these same drugs, jurisdictions invariably specify mass quantities for injection rather than dosing by body weight. We sought to determine the actual doses used in executions using postmortem body weights recorded by the Office of the Medical Examiner. North Carolina injects 3 g of thiopental; however, in Protocol B inmates were given half the thiopental at the end, once all painful stimuli were administered and death should have been achieved. Thus we considered only the first 1.5 g for Protocol B. Overall the median thiopental dose was 20.3 mg/kg (range 11.2–44 mg/kg, $n = 40$) (Figure 1C). Virtually all of the lowest doses were under Protocol B, although four very large individuals executed under Protocols A and C received less than the median dose. Eyewitness reports of inmate







**Figure 1.** Lethal Injection Executions in North Carolina

(A) Schematic depicting quantity and order of drug administration in the three protocols.

(B) Time to death by protocol, calculated as the interval from execution start time to declaration of death, minus 5 min (see Methods).

(C) Actual dose of thiopental by body weight (not available for all inmates). In Protocol B, 1.5 g of thiopental was given after the pancuronium bromide and potassium chloride, once painful stimuli had been administered and death should have occurred; accordingly, only the first 1.5 g dose is plotted.

doi:10.1371/journal.pmed.0040156.g001

movement including convulsions and attempts to sit up in four executions [15] did not cluster in the lowest doses, but rather occurred at doses of 17.1, 18.9, 19.6, and 21 mg/kg, all performed under Protocol B. Calculated median doses of pancuronium bromide and potassium chloride were 0.46 mg/kg (range 0.28–0.46 mg/kg) and 1.83 mEq/kg (range 1.11–2.35 mEq/kg), respectively.

### Data from California Executions

Executions in California provided a second insight into the methodologies and outcomes in lethal injections. The public version of the California protocol specifies injection of 5 g of thiopental, 100 mg of pancuronium bromide, and 100 mEq of potassium chloride [9]. California Department of Corrections form 226A, "Lethal Injection—Execution Record," consists of a table listing "operations," including injection of each drug, cessation of respiration, flatlining of the cardiac monitor, and pronouncement of death, with columns for time, heart rate, and respiration rate. Such execution records were available for nine of the 11 lethal injections performed in San Quentin California State Prison from 1996 to 2006 [9,10]. One record was incomplete and contradictory and is not reported here. In the remaining eight executions, respiration rate ceased from 1 min (inmate WB1966) to 9 min (CA2006) after the injection of thiopental (Figure 2). Cessation of respiration was noted coincident with (WB1966, SW2005, CA2006) or up to 3 min after (SA2002) injection of pancuronium bromide. Flatlining of the cardiac monitor occurred 2 min (DR2000) to 8 min (JS1999) after the last injection of potassium chloride. The records indicate that a second dose of potassium chloride was used in the execution of SA2002, and the California warden has said that additional doses were used in two other executions, one being CA2006 and the other unknown [16]. Eyewitness reports document "sudden and extreme" convulsive movements 3–4 min into the execution of MB1999 [17] and more than 30 heaving, convulsive movements of the chest and abdomen of SA2002 [18].

## Discussion

Most US executions are beset by procedural problems that could lead to insufficient anesthesia in executions. This hypothesis has been supported by findings of low postmortem blood thiopental levels and eyewitness accounts of problematic executions. Herein we report evidence that the design of the drug scheme itself is flawed. Thiopental does not predictably induce respiratory arrest, nor does potassium chloride always induce cardiac arrest. Furthermore, on the basis of execution data and clinical, veterinary, and laboratory animal studies, we posit that the specified quantity of thiopental may not provide surgical anesthesia for the duration of the execution. Thus some inmates may experience the sensations of pancuronium-induced paralysis and respiratory arrest.

In the United States and Europe, techniques of animal euthanasia for clinical, laboratory, and agricultural applications are rigorously evaluated and governed by professional, institutional, and regulatory oversight. In university and laboratory settings, local oversight bodies known as Animal Care and Use Committees typically follow the American Veterinary Medical Association's guidelines on euthanasia, which consider all aspects of euthanasia methods, including drugs, tools, and expertise of personnel in order to minimize pain and distress to the animal. Under those guidelines, lethal injections of companion or laboratory animals are limited to injection by qualified personnel of certain clinically tested, Food and Drug Administration–approved anesthetics or euthanasics, while monitoring for awareness.

In stark contrast to animal euthanasia, lethal injection for judicial execution was designed and implemented with no clinical or basic research whatsoever. To our knowledge, no ethical or oversight groups have ever evaluated the protocols and outcomes in lethal injection. Furthermore, there are no published clinical or experimental data regarding the safety



**Figure 2.** Lethal Injection Executions in California

Depicted are duration of respiration and heart rate after initiation of the thiopental injection at time 0. Injection of pancuronium bromide is indicated by the grey arrow, potassium chloride by the black arrow. Note that additional injections of potassium chloride in SA2002 and of pancuronium bromide in WB1996. SW2005 was noted to be breathing 3 min after thiopental, but not at the time of pancuronium bromide injection; the exact time respiration ceased was not recorded. DR2000 was noted to have chest movements two minutes after respiration was noted to have ceased. *A second dose of potassium chloride were administered to CA2006, but not noted on the log. A third, unidentified inmate was also given a second dose of potassium chloride, according to the warden (see text).
doi:10.1371/journal.pmed.0040156.g002

and efficacy of the three-drug lethal injection protocol. Until the unprecedented and controversial use of bispectral index monitoring in the last two North Carolina lethal injections [19], no monitoring for anesthesia was performed. Given this paucity of knowledge and documentation, we sought to evaluate available data in order to determine the efficacy of the three drug protocol.

The designers of lethal injection intended that each of the drugs be fatal independently and that the combination provide redundancy [2]. Moreover, in legal challenges to the death penalty, the leading expert witness testifying on behalf of the states routinely asserts that 3 g of thiopental alone is a lethal dose in almost all cases [14]. The data presented here, however, suggest that thiopental alone might not be lethal. First, extrapolating from clinical use, the lowest dosages used in some jurisdictions would not be expected to kill. Calculated dosages in North Carolina executions using 3 g of thiopental ranged from 10 to 45 mg/kg. Assuming inmates are roughly the same size across jurisdictions, the dose range would be 17–75 mg/kg in California, where 5 g of thiopental is used, and 6.6–30 mg/kg in Virginia and other jurisdictions, which use 2 g. Thus, at the lowest doses, thiopental would be given near the upper range of that recommended for clinical induction of anesthesia (3–6.6 mg/kg)—clearly not a dose designed to be fatal [20]. Second, the calculated doses used across lethal injections are only 0.1–2 times the $LD_{50}$ (dose required to kill 50% of the tested population) of thiopental in dogs (37 mg/kg), rabbits (35 mg/kg), rats (57.8 mg/kg), and mice (91.4 mg/kg) [21, 22]. Third, intravenous delivery of thiopental alone is not recommended by The Netherlands Euthanasics Task Force, which concluded "it is not possible to administer so much of it that a lethal effect is guaranteed" [23], even in their population of profoundly ill patients.

The most compelling evidence that even 5 g of thiopental alone may not be lethal, however, is that some California inmates continued to breathe for up to 9 min after thiopental was injected. This observation directly contradicts testimony of that state's expert witness, who asserted that "this dose of thiopental sodium will cause virtually all persons to stop breathing within a minute of drug administration" and that "virtually every person given 5 grams of thiopental sodium will have stopped breathing prior to the administration of the pancuronium bromide" [24]. The witness has made identical statements regarding 3 g of thiopental [14]. Indeed, the clinical literature is replete with examples of patients experiencing respiratory failure after even low doses of thiopental [25]. Others, however, experience merely transient, nonfatal apnea. Of course, for inmates who did not stop breathing with thiopental alone, it is impossible to know whether the thiopental solution was correctly mixed, whether the entire dose was administered intravenously, or whether the apparent resistance was due to bolus dosing or individual variation. It remains possible, however, that bolus dosing of 5 g of thiopental alone might not be fatal in all persons. Indeed, nonhuman primates given as much as 60 mg/kg (the mass equivalent of 6 g for a 100 kg man) experienced prolonged sleep, but ultimately recovered [26].

If thiopental does not reliably kill the inmates, then perhaps death is effected by potassium chloride. Rapid intravenous or intracardiac administration of 1–2 mmol/kg potassium chloride under general anesthesia is considered acceptable for euthanasia of large animal species; thus the 1.11–2.35 mmol/kg doses given in North Carolina's lethal injections ought to be fatal. If potassium chloride contributes to death through cardiotoxicity, however, cardiac activity ought to cease more quickly when potassium is used than when it is not. Indeed, such is the principle behind the animal euthanasia agent, Beuthanasia-D Special, in which the cardiotoxic effects of phenytoin synergize with the central nervous system–depressive effects of pentobarbital, accelerating death over pentobarbital alone [27]. In contrast, our analysis shows that use of potassium chloride in North Carolina's Protocol C did not hasten death (defined as flatlining of the ECG) over Protocol A, which used thiopental and pancuronium alone. Moreover, in California executions,

**Table 1.** Reported Duration of Sleep or Anesthesia after Bolus IV Injections of Thiopental in Experimental Animals

| Species | Dose (mg/kg) | *n* | Mean Duration of Sleep[a] (min) | Mean Duration of Anesthesia[b] (min) | Reference | Calculated HED[c] (mg/kg) |
|---|---|---|---|---|---|---|
| Mouse | 30 | | 4.7–6.4 | | [43] | 2.4 |
| Rat | 20 | | 4.0–7.0 | | [43] | 3.2 |
| | 25 | | 22.6 | | [43] | 4 |
| | 18 | 32 | 9.3–10.5 | | [44] | 2.88 |
| | 22 | 7 | 30.0 ± 6.0 | | [44] | 3.52 |
| Rabbit | 20 | 1 | 0 | 0 | [45] | 6.4 |
| | 21 | 10 | 28 | | [21] | 6.72 |
| | 22 | 16 | 14.8–15.2 | | [44] | 7.04 |
| Dog | 10.2 | 5 | 10.8 | 1.8 | [46] | 5.51 |
| | 10.9 | 5 | 11.4 | 1.4 | [46] | 5.89 |
| | 15 | 8 | 26 | 8.5 | [47] | 8.1 |
| | 25 | 22 | 74.4 ± 7.1 | | [47] | 13.5 |
| Sheep | 20 | 4 | | 18.3 ± 5.10 | [48] | 18.1 |
| | 25 | | 30–45 | 15 | [49] | 22.6 |
| Goat | 12.7–13.9 | 4 | | 12.0 ± 5.20 | [48] | 8.8–9.6 |
| Swine | 13.8–25.0 | 4 | | 5.5 ± 2.7 | [48] | 12.3–22.4 |
| Cattle | 20 | 4 | | 32.25 ± 14.36 | [46] | 28.8 |
| Nonhuman primate | 60 | 1 | 95 | | [43] | 16.5 |

[a]From loss to return of righting reflex or voluntary movement.
[b]Typically corneal areflexia.
[c]Human equivalent dose was calculated as HED = animal dose (mg/kg) × (animal weight [kg]/human weight [kg])$^{0.33}$ [35,36].
doi:10.1371/journal.pmed.0040156.t001

ECG flatlining was noted from 2 to 9 min after potassium chloride administration. This observation contrasts sharply with reports of accidental bolus IV administration of concentrated potassium chloride solution, in which patients experienced complete cardiopulmonary arrest almost immediately upon injection [28]. The North Carolina and California data together suggest that potassium chloride might not be the lethal agent in lethal injection.

Given that neither thiopental nor potassium chloride can be construed reliably to be the agent of death in lethal injection, death in at least some inmates might have been due to respiratory cessation from the use of pancuronium bromide. The typical use of 0.06–0.1 mg/kg pancuronium bromide under balanced anesthesia produces 100% neuromuscular blockade within 4 min, with approximately 100 min required for 25% recovery [29]. The doses used in North Carolina were some 3–11 times greater than the typical intubation dose, and thus would be expected to produce more rapid paralysis of many hours duration and complete respiratory arrest [30]. Indeed, pancuronium might have been the agent of death even in inmates who ceased breathing coincident with or shortly after injection of pancuronium, rendering permanent the thiopental-induced apnea. In addition, because pancuronium bromide is effective even when delivered subcutaneously or intramuscularly, pancuronium is likely the sole agent of death when IV catheter misplacement or blowout impairs systemic delivery of the other two drugs. In such cases death by suffocation would occur in a paralyzed inmate fully aware of the progressive suffocation and potassium-induced sensation of burning. This was likely the experience of Florida inmate Angel Diaz, whose eyes were open and mouth was moving 24 min into his execution and who was pronounced dead after 34 min. Findings of two 30-cm burns over both antecubital fossae prompted the medical examiner to conclude that the IV lines were misplaced and the drugs were delivered subcutaneously [31].

Executions such as Diaz's, in which additional drugs were required, constitute further evidence that the lethal injection protocols are not adequate to ensure a predictable, painless death. Court documents and news reports indicate that at least Virginia [32], California [10], and Florida [31] have administered additional potassium chloride in multiple executions when the inmate failed to die as expected. If a Virginia execution takes too long and if the inmate fails to die, the protocol indicates that additional pancuronium and potassium chloride should be injected, although there is no provision for additional thiopental [32]. In cases such as Diaz's, additional drugs may have been required due to technical problems with delivery, but it remains possible that in others, the standard drug protocol failed to kill.

Given the uncertainty surrounding the mechanism of death and low postmortem blood thiopental levels in some executed inmates [7], one must ask whether adequate anesthesia is maintained to prevent awareness and suffering. Medical experts on both sides of the lethal injection debate have asserted that 3 g of thiopental properly delivered should reliably result in either death or a long, deep surgical plane of anesthesia [13,14]. In support of this contention, continuous or intermittent thiopental administration was formerly used for surgical procedures lasting many hours. In one study, 3.3–3.9 g given to patients over 25–50 min resulted in sleep for 4–5.5 h [33]. Depth and duration of thiopental anesthesia depends greatly upon dose and rate of administration, however, and bolus dosing results in significantly different pharmacokinetics and duration of efficacy than administration of the same quantity of drug at a lower rate [22].

In the modern practice of anesthesia, thiopental is used solely to induce a few moments of anesthesia prior to administering additional agents. Anesthesiologists are taught

to administer a small test dose while assessing patient response and the need for additional doses [20]. Such stepwise administration and evaluation has been the practice from the first reports of thiopental usage in 1934, due to the known potential for barbiturate-induced respiratory arrest [34]. It was early recognized that age, body composition, health status, anxiety, premedication, and history of substance abuse clearly influence response to thiopental, with some individuals showing marked resistance to standard doses [35] and others fatal sensitivity [25]. Thus the historical and modern clinical use of thiopental results from its cautious application to prevent respiratory arrest both in the typical patient and the abnormally susceptible. In consequence, there is almost no information about duration of anesthesia following large bolus doses of thiopental in unpremedicated patients, and there are few living anesthesiologists with clinical experience relevant to lethal injection protocols.

Unlike in clinical medicine, however, bolus injection of thiopental is regularly practiced in laboratory animals and veterinary medicine. Standard texts specify from 6 to 50 mg/kg thiopental, depending on the species, for 5–10 min of anesthesia [36], including 18–22 mg/kg for 10–15 min of anesthesia in dogs, pigs, sheep, and swine [37]. Such dosages are conservative guidelines based on average responses of animals in experimental trials (Table 1), with the assumption that respiration and depth of anesthesia will be assessed in individual animals prior to onset of the procedure. (In addition, thiopental is not recommended for painful procedures in animals.) Withholding or administering additional dosages would compensate for individual variation in response.

Although species differences complicate pharmacological comparisons from animals to humans, animal studies are the basis for virtually all human drug trials. According to FDA guidelines, toxicity endpoints for drugs administered systemically to animals are typically assumed to scale well across species when doses are normalized to body surface area (i.e., mg/m$^2$) [38]. Calculating the human equivalent dose (HED) as recommended by the FDA [39] gives a more conservative estimate of thiopental equivalencies across species than does using simple mg/kg comparisons (Table 1). Swine in particular are regarded as an excellent model of human cardiopulmonary and cerebrovascular physiology, with comparable size, body composition, and brain perfusion rates [40]. Comparing the HED for thiopental anesthesia in swine to lethal injection dosages, we conclude that at least some inmates at the lower end of the thiopental dose range might have experienced fleeting or no surgical anesthesia, while others at the higher end of the range might have received doses predicted to induce more prolonged anesthesia (Table 1). Such a prediction is impossible to evaluate, however, because any evidence of suffering would be masked by the effects of pancuronium.

Our study is necessarily limited in scope and interpretations. Given the secrecy surrounding lethal injections, we were able to analyze only a small fraction of the 891 lethal injections in the US to date. Indeed, the majority of executions actually take place in states such as Texas and Virginia, where the protocols and procedural problems are likely similar to the ones described, but where the states are unwilling to provide information [7]. Not only are available data limited, however, medical literature addressing the effects of these drugs at high doses and in combination is nonexistent, emphasizing the failure of lethal injection practitioners to design and evaluate rigorously a process that ensures reliable, painless death, even in animals. In consequence, the adequacy of anesthesia and mechanism of death in the current lethal injection protocol remains conjecture.

Despite such limitations, our analysis of data from more forthcoming states along with reports of problematic executions and judicial findings [41] together indicate that the protocol of lethal injection for execution is deeply flawed. Technical difficulties are clearly responsible for some mishandled executions, such as Diaz's. Better training of execution personnel and altering delivery conditions may not "fix" the problem [41, 42], however, because the drug regimen itself is potentially inadequate. Our analysis indicates that as used, thiopental might be insufficient both to maintain a surgical plane of anesthesia and to predictably induce death. Consequently, elimination of pancuronium or both pancuronium and potassium, as has been suggested in California [41], could result in situations in which inmates ultimately awaken.

With the growing recognition of flaws in the lethal injection protocol, 11 states have now suspended the death penalty, with nine of those seeking resolution of issues surrounding the process [42]. In California and Florida, commissions of experts have been charged with evaluating and refining lethal injection protocols. As deliberations begin, we suggest that the secrecy surrounding protocol design and implementation should be broken. The available data or lack of data should be made public and deliberations should be open and transparent.

## Supporting Information

**Alternative Language Abstract S1.** Translation into Spanish by Francisco López-Muñoz

Found at doi:10.1371/journal.pmed.0040156.sd001 (24 KB DOC)

## Acknowledgments

**Author contributions.** TAZ, JPS, DAL, and LGK conceived the study. TAZ and JPS obtained protocol information and execution data. TAZ, DAL, and LGK analyzed the data and published literature. DAL, LW, and RW provided clinical insights. TAZ, JPS, and FLM provided historical perspectives and references. All authors contributed to writing and editing the manuscript.

**References**

1. Denno D (2002) When legislatures delegate death: The troubling paradox behind state uses of electrocution and lethal injection and what it says about us. Ohio State Law Journal 63: 63–260. Available at: http://moritzlaw.osu.edu/lawjournal/issues/volume63/number1/denno.pdf. Accessed 16 March 2007.
2. Fellner J, Tofte S (2006) So long as they die: Lethal injection in the United States. Human Rights Watch. Available at: http://hrw.org/reports/2006/us0406. Accessed 16 March 2007.
3. Oklahoma Statute Title §22-1014(A) Available at: http://www.lsb.state.ok.us/osstatuestitle.html. Accessed 16 March 2007.
4. United States District Court, Western District of Oklahoma (20 July 2005) Complaint and Motion to Dismiss, Anderson v. Evans. Case Number 5-825. Document Number 1, pp. 25–34.
5. US District Court, Western District of Oklahoma (6 September 2005) Complaint and Motion to Dismiss, Anderson v. Evans. Case Number 5-825. Document Number 26, pp. 3–4.
6. Dundee JW (1960) Alterations in response to somatic pain associated with anaesthesia. II. The effect of thiopentone and pentobarbitone. Br J Anaesth 32: 407–414.
7. Koniaris LG, Zimmers TA, Lubarsky DA, Sheldon JP (2005) Inadequate anaesthesia in lethal injection for execution. Lancet 365: 1412–1414.



8. North Carolina Department of Correction (2007) News regarding scheduled executions. Available at: http://www.doc.state.nc.us/dop/deathpenalty/execution_news.htm. Accessed: 19 March 2007.
9. United States District Court, Northern District of California (20 January 2006) Exhibit A to Motion for TRO, Morales v. Hickman. Case Number 6–219. San Quentin Operational Procedure No. 770. Available at: http://www.law.berkeley.edu/clinics/dpclinic/Lethal%20Injection%20Documents/California/Morales/Morales%20Dist%20Ct.Cp/Ex%20A%20to%20TRO%20motion%20(Procedure%20No.%20770).pdf. Accessed 16 March 2007.
10. United States District Court, Northern District of California (20 January 2006) Exhibit 2 to Exhibit C in Motion for TRO, Morales v. Hickman. Case Number 6–219. Document Number 15–2. Available at: http://www.law.berkeley.edu/clinics/dpclinic/Lethal%20Injection%20Resource%20Pages/resources.ca.html. Accessed 16 March 2007.
11. United States Supreme Court (6 March 2007) Brief for Amicus Habeas Corpus Resource Center, Hill v. McDonough. Case Number 05–8794. Available at: http://www.law.berkeley.edu/clinics/dpclinic/Lethal%20Injection%20Documents/Florida/Hill/2006.03.06%20amicus%20hcrc.pdf. Accessed 16 March 2007.
12. United States District Court, Eastern District of North Carolina (31 October 2005) Polk Deposition, Page v. Beck. Case Number 5:04-ct-4. Document Number 98.
13. United States District Court, Eastern District of North Carolina (3 November 2005) Second Heath Affidavit, Page v. Beck. Case Number 4–04. Document Number 102.
14. United States District Court, Eastern District of North Carolina (27 September 2004) Affidavit of Dershwitz, Perkins v. Beck. Case Number 04–643. Document Number 7, pp. 22–31.
15. United States District Court, Eastern District of North Carolina (7 April 2006) Order, Brown v. Beck. Case Number 5:06-CT-3018-H. Available at: http://deathpenaltyinfo.org/Brownorder.pdf. Accessed 16 March 2007.
16. United States District Court, Northern District of California (25 January 2006) Second Declaration of Dr. Mark Heath, Morales v. Hickman. Case Number 06–219. Document Number 22–1.
17. United States District Court, Northern District of California (20 January 2006) Declaration of Patterson, Morales v. Hickman. Case Number 06–219. Document Number 14. Available at: http://www.law.berkeley.edu/clinics/dpclinic/Lethal%20Injection%20Documents/California/Morales/Morales%20Dist%20Ct.Cp/Ex%20B%20to%20TRO%20Motion.pdf. Accessed 16 March 2007.
18. United States District Court, Northern District of California (20 January 2006) Declaration of Rocconi, Morales v. Hickman. Case Number 06–219. Document Number 15–4. Available at : http://www.law.berkeley.edu/clinics/dpclinic/Lethal%20Injection%20Documents/California/Morales/Morales%20Dist%20Ct.Cp/Ex%203%20to%20Heath%20Decl%20(Rocconi%20Decl%20re.%20Anderson%20execution).pdf. Accessed 16 March 2007.
19. Steinbrook R (2006) New technology, old dilemma—Monitoring EEG activity during executions. N Engl J Med 354: 2525–2527.
20. Abbott Laboratories (1993 November) Pentothal for injection, USP (Thiopental Sodium) Reference 06-8965-R10. A similar document is available at: http://www.rxlist.com/cgi/generic/thiopental.htm. Accessed 16 March 2007.
21. Werner HW, Pratt TW, Tatum AL (1937) A comparative study of several ultrashort-acting barbiturates, nembutal, and tribromethanol. J Pharmacol Exp Ther 60: 189–197.
22. Robinson MH (1945) The effect of different injection rates on upon the AD50, LD50 and anesthetic duration of pentothal in mice, and strength-duration curves of depression. J Pharmacol Exp Ther 85: 176–191.
23. (1994) Administration and compounding of euthanasic agents. The Hague: Royal Dutch Society for the Advancement of Pharmacy.
24. United States District Court, Northern District of California (20 January 2006) Declaration of Dershwitz, Morales v. Woodford. Case Number 06–219. Document Number 15.
25. Harris WH (1943) Collapse under pentothal sodium. Lancet 242: 173–174.
26. Taylor JD, Richards RK, Tabern DL (1951) Metabolism of $^{35}$S thiopental (pentothal): Chemical and paper chromatographic studies of $^{35}$S excretion by the rat and monkey. J Pharmacol Exp Ther 104: 93–102.
27. (2005) Freedom of Information Summary. Original Abbreviated New Animal Drug Application. Euthanasia-III Solution. Rockville (Maryland): Food and Drug Administration. Available at: http://www.fda.gov/cvm/FOI/200-280020305.pdf. Accessed 6 March 2007.
28. Wetherton AR, Corey TS, Buchino JJ, Burrows AM (2003) Fatal intravenous injection of potassium in hospitalized patients. Am J Forensic Med Pathol 24: 128–131.
29. Gensia Sicor Pharmaceuticals (2003 October) Pancuronium bromide injection (prescribing information and material safety data sheet). Available at: http://www.sicor.com/products/1044.html. Accessed 16 March 2007.
30. Mehta MP, Sokoll MD, Gergis SD (1988) Accelerated onset of non-depolarizing neuromuscular blocking drugs: Pancuronium, atracurium and vecuronium. A comparison with succinylcholine. Eur J Anaesthesiol 5: 15–21.
31. Tisch C, Krueger C (14 December 2006) Second dose needed to kill inmate. St Petersburg Times. State/Suncoast edition. St. Petersburg. p. 1A. Available at: http://www.sptimes.com/2006/12/14/State/Second_dose_needed_to.shtml. Accessed 16 March 2007.
32. United States Supreme Court (6 March 2006) Brief for Amicus Curiae, Darick Demorris Walker, Hill v. McDonough. Case Number 05–8794. Available at: http://www.jenner.com/files/tbl_s69NewsDocumentOrder/FileUpload500/674/Brief_Amicus_Curiae_Walker.pdf. Accessed 16 March 2007.
33. Brodie BB, Mark LC, Lief PA, Bernstein E, Papper EM (1951) Acute tolerance to thiopental. J Pharmacol Exp Ther 102: 215–218.
34. Heard KM (1936) Pentothal: A new intravenous anesthetic. Can Med Assn J 34: 628–634.
35. Mallison FB (1937) Pentothal sodium in intravenous anaesthesia. Lancet 230: 1070–1073.
36. Kohn DF, Wixson SK, White WJ, Benson GJ, editors (1997) Anesthesia and analgesia in laboratory animals. New York: Academic Press. 426 p.
37. Plumb DC (2005) Veterinary drug handbook. 5th Ed. Stockholm (Wisconsin): PharmaVet. 929 p.
38. Mordenti J, Chappell W (1989) The use of interspecies scaling in toxicokinetics. In: Yacobi A, Kelly J, Batra V, editors. Toxicokinetics and new drug development. New York: Pergamon Press. pp. 42–96.
39. Center for Drug Evaluation and Research (2005) Guidance for industry estimating the maximum safe starting dose in initial clinical trials for therapeutics in adult healthy volunteers. Rockville (Maryland): Food and Drug Administration. Available at: http://www.fda.gov/CDER/GUIDANCE/5541fnl.htm. Accessed 16 March 2007.
40. Hannon JP, Bossone CA, Wade CE (1990) Normal physiological values for conscious pigs used in biomedical research. Lab Anim Sci 40: 293–298.
41. United States District Court, Northern District of California (15 February 2006) Memorandum of Intended Decision; Request for Response from Defendants, Morales v. Tilton. Case Number C 06–219, C 06–926. Available at: http://www.deathpenaltyinfo.org/CalifLethalInjection.pdf. Accessed 16 March 2007.
42. Koniaris LG, Sheldon JP, Zimmers TA (2007) Can lethal injection for execution really be "fixed"? Lancet 369: 352–353.
43. Mirsky JH, Giarman NJ (1955) Studies on the potentiation of thiopental. J Pharmacol Exp Ther 114: 240–249.
44. Richards RK, Taylor JD, Kueter KE (1953) Effect of nephrectomy on the duration of sleep following administration of thiopental and hexobarbital. J Pharmacol Exp Ther 108: 461–473.
45. Gruber CM, Gruber JCM, Colosi N (1937) The effects of anesthetic doses of sodium thio-pentobarbital, sodium thio-ethamyl and pentothal sodium upon the respiratory system, the heart and blood pressure in experimental animals. J Pharmacol Exp Ther 60: 143–147.
46. Ramsey H, Haag HB (1946) The synergism between the barbiturates and ethyl alcohol. J Pharmacol Exp Ther 88: 313–322.
47. Wyngaarden JB, Woods LA, Ridley R, Seevers MH (1948) Anesthetic properties of sodium 5-allyl-5-(1-methyl-butyl)-2-thiobarbiturate (surital) and certain other thiobarbiturates in dogs. J Pharmacol Exp Ther 95: 322–327.
48. Sharma RP, Stowe CM, Good AL (1970) Studies on the distribution and metabolism of thiopental in cattle, sheep, goats and swine. J Pharmacol Exp Ther 172: 128–137.
49. Komar E (1991) Intravenous anaesthesia in the sheep. Proc Int Congr Vet Anesth, 4th. Utrecht (The Netherlands). pp. 209–210.

## Editors' Summary

**Background.** Lethal injection is a common form of execution in a number of countries, most prominently the US and China. The protocols currently used in the US contain three drugs: an ultrashort-acting barbiturate, thiopental (which acts as an anesthetic, but does not have any analgesic effect); a neuromuscular blocker, pancuronium bromide (which causes muscle paralysis); and an electrolyte, potassium chloride (which stops the heart from beating). Each of these drugs on its own was apparently intended by those who derived the protocols to be sufficient to cause death; the combination was intended to produce anesthesia then death due to respiratory and cardiac arrest. Following a number of executions in the US, however, it has recently become apparent that the regimen as currently administered does not work as efficiently as intended. Some prisoners take many minutes to die, and others become very distressed.

**Why Was This Study Done?** It is possible that one cause of these difficulties with the injections is that the staff administering the drugs are not sufficiently competent; doctors and nurses in the US are banned by their professional organizations from participating in executions and hence most personnel have little medical knowledge or skill. Alternatively, the drug regimens used might not be effective; it is not clear whether they were derived in any rational way. The researchers here wanted to investigate the scientific basis for the protocols used.

**What Did the Researchers Do and Find?** They analyzed data from some of the few states (North Carolina and California) that release information on executions. They also assessed the regimens with respect to published data from clinical, laboratory, and veterinary animal studies. The authors concluded that in the current regimen thiopental might not be fatal and might be insufficient to induce surgical anesthesia for the duration of the execution, and that potassium chloride does not reliably induce cardiac arrest. They conclude therefore that potentially aware inmates could die through asphyxiation induced by the muscle paralysis caused by pancuronium.

**What Do These Findings Mean?** The authors conclude that even if lethal injection is administered without technical error, those executed may experience suffocation, and therefore that "the conventional view of lethal injection as an invariably peaceful and painless death is questionable." The Eighth Amendment of the US Constitution prohibits cruel and unusual punishment. The results of this paper suggest that current protocols used for lethal injection in the US probably violate this amendment.

**Additional Information.** Please access these Web sites via the online version of this summary at http://dx.doi.org/10.1371/journal.pmed.0040156.

- In a linked editorial the *PLoS Medicine* editors discuss this paper further and call for the abolition of the death penalty
- The Death Penalty Information Center is a rich resource on the death penalty both in the US and internationally
- Information on challenges to lethal injection in various states, including California and North Carolina, is available from the University of California, Berkeley School of Law
- Human Rights Watch monitors executions in the US
- Amnesty International campaigns against the death penalty
- A compendium of death penalty-related links are available from a pro-death-penalty site, the Clark County Prosecuting Attorney